UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

PAMELA WANSTALL,                    )
AS PERSONAL                         )
REPRESENTATIVE AND                  )
ADMINISTRATOR                       )
OF THE ESTATE OF RICHARD            )
WANSTALL,                           )
                                    )        Civil Action File No. 2:24-CV-680
        v.                          )
                                    )
D40 GRAVEL LLP,                     )
TOWN OF BURKE, VERMONT,             )
and CALEDONIA SHERIFF'S             )
DEPARTMENT                          )
                                    )

## AMENDED COMPLAINT

NOW COMES Plaintiff, Pamela Wanstall, Individually, and as the Personal

Representative and Administrator of the Estate of Richard Wasntall, by and through her

attorneys, Behrens Venman, PLLC, and McVeigh Skiff, LLP, for their Complaint, allege

as follows:

1.      Plaintiff, Pamela Wanstall ("Plaintiff"), is a resident of the Town of Marblehead

Massachusetts, County of Essex and State of Massachusetts. At all times material herein,

Plaintiff lived with her husband, Richard Wanstall (DOB 07/08/1968), in Marblehead

Massachusetts. Richard Wanstall died on April 29, 2023.

2.      At the time of his death, Richard Wanstall was married to Plaintiff. Richard and

Plaintiff had four children together: Adam Charles Wanstall (4-1-96), Andrew Richard

Wanstall (8-8-99), Emma Hai Lin Wanstall (12-31-03) and Ella Sang-A Wanstall (9-19-

08).

1

3.      The Essex County Probate Court in Massachusetts appointed Plaintiff as the personal representative of the Estate of Richard Wanstall on August 21, 2023. (See Exhibit 1). The interested parties in this action are Pamela Wanstall and their four children.

4.      Defendant D40 Gravel LLP d/b/a Rasputitsa Gravel Race, ("Defendant D40") is a Vermont limited liability partnership with its principal place of business in Newport, Vermont.

5.      Defendant Town of Burke ("Defendant Burke"), is a municipality in Vermont located in Caledonia County, State of Vermont. At all times material to this action, Defendant Burke acted through its Selectboard members' acts or omissions. At all times material to this action, Defendant Burke's Selectboard acted as officers and employees of the Town of Burke.

6.      Defendant Caledonia County Sheriff's Office, ("Defendant Sheriff") is a county office within the County of Caledonia with its principal place of business in St. Johnsbury, Vermont. Defendant Sheriff, among other things, provides law enforcement and security services for Caledonia County, including the Town of Burke. At all times material to this action, Defendant Sheriff acted through Sheriff Hemond's or his deputies', acts or omissions.

## JURISDICTION

7.      This court has original jurisdiction of this action in that the matter in controversy, without interest and costs, exceeds the sum or value of $75,000, and is between citizens of different states.  Title 28 U.S.C.A. 1332.

2

## COMMON ALLEGATIONS

8.      Defendant D40 runs an annual gravel bicycle race called "the Rasputitsa." The Rasputitsa bicycle race at issue in this case occurred on April 29, 2023.

9.      The Rasputitsa is a 100-kilometer bicycle race over public roads in the Town of Burke, Vermont. The race had been held in the Town of Burke since 2015 but closed in 2020 and 2021 due to Covid. The race resumed and was held in April of 2022. Each year, from 2015 until 2023, Defendant Burke's Selectboard authorized Defendant D40 to operate the Rasputitsa within the Town of Burke and to use the public roads within the Town. This approval occurred at the Town/Selectboard meetings.

10.     Mr. Wanstall visited a website promoting the Rasputitsa race owned and operated by Defendant D40. When Mr. Wanstall registered online on October 27, 2022, he paid a fee of $150. Mr. Wanstall had never ridden the Rasputitsa before and this was his first time registering for the race. The 2023 Rasputitsa was the first time Mr. Wanstall participated in the Rasputitsa or any gravel race.

11.     As part of the online registration process, Mr. Wanstall signed a waiver of liability. As part of the waiver, Mr. Wanstall agreed to abide by the Rasputitsa organization's specific rules.

12.     When Mr. Wanstall registered, the registration process did not limit participants by experience or affiliation with any particular cycling club. All that was required to participate in the Rasputitsa was to pay the registration fee and register online. The Rasputitsa was open to all who signed up for it. The 2023 Rasputitsa race was open to the general public.

13.     The event guide to the 2023 Rasputitsa race laid out one material rule: "all roads are

3

open to traffic. For your safety, please be constantly aware of your surroundings and abide by normal traffic rules."

14.    Mr. Wanstall began the race on April 29, 2023 at approximately 8:30 a.m. There were three different race distances – 40k, 70k and 100k. Each distance has a different start time, which enables riders to finish together at the Burke Mountain Lodge. The entire race (the 40, 70 and 100 k races) had in excess of 2000 riders. Upon information and belief, the 100k race had in excess of 1200 riders start and ride the course.

15.    Mr. Wantall registered for the 100k race and started the race on April 29, 2023 at approximately 8:30 a.m.

16.    Prior to the 2023 race, Defendant D40, Defendant Burke and Defendant Sheriff were aware of the dangers of bicyclists racing on public roads during the Rasputitsa race. Specifically, there were safety concerns of riders colliding with vehicles. Prior to 2023, Defendant Sheriff's Office, Defendant Burke and Defendant D40 were aware of the amount of traffic during the Rasputitsa and the potential for accidents at traffic intersections.

17.    Prior to the 2023 race, Defendant D40 hired Defendant Sheriff's Office to help maintain traffic control at certain intersections of the race. In 2018, the Sheriff's deputies were hired for 6 hours for traffic control at the intersection of Route 114 and Pinkham Road. In 2019, Defendant Sheriff's Office was hired for 6.0 hours to maintain traffic control at Burke Mountain Road and Route 114 (8:00 am to 10:00 a.m.) and White School Road and Route 114 (10:00 a.m. to 2:00 p.m.).

18.    Prior to the 2023 race, upon information and belief, Defendant D40 was aware of complaints that too many riders were using the public roads during the Rasputitsa.

19.    On June 6, 2022, Defendants Burke, D40 and Sheriff's Office attended a Town of

4

Burke Selectboard Meeting to discuss the 2022 race and the upcoming 2023 race. A specific safety concern was expressed by a local business at that meeting. As a result of the June 2022, Selectboard meeting, Defendant D40 agreed to work more closely with the Town of Burke to address any safety concerns for the upcoming 2023 Rasputitsa.

20.    In response to the safety concerns expressed at the June 6, 2022 Town Meeting, the minutes reflected that Sheriff Hemond "reported that he thought there was good traffic control, and the signage was correct for the Rasputitsa race. Burke road patrols are proceeding according to contract. He stated that the department wants to be approachable and available to converse with residents."

21.    Defendant Burke's selectboard members were specifically aware of the safety issues with bike races being held on public roads within the Town. In a September 2022 Selectboard meeting, a local bike race wanted to use part of a public road, Pinkham Road. While the racers were on the public road, marshalls would stop traffic when necessary for safety purposes. Based on this plan, Defendant Burke, through its selectboard, approved the race.

22.    By approving the previous Rasputitsa races and the 2023 Rasputitsa race, Defendant Burke, through its selectboard, financially benefitted the residents of the Town and local businesses.

23.    Approving and permitting Defendant D40 to commandeer its roads for the Rapsutitsa, Defendant Burke, through its selectboard, engaged in a proprietary function as Defendant Burke and its selectboard, knew and expected the race to provide economic benefits to the Town's resident and businesses.

24.    At all times material to this action, Defendant D40 designed the 2023 Rasputitsa

course over the public roads.

25.     At all times material to this action, Defendant D40 had the authority to control traffic during the race by placing signage and marshals along the public roads, including at all intersections.

26.     At all times material to this action, Defendant D40 could have had sufficient volunteer marshals to monitor and control the traffic at each and every intersection of the Rasputitsa.

27.     At all times material to this action, Defendant Burke designed and/or approved the design of the 2023 Rasputitsa course over its public roads.

28.     At all times material to this action, Defendant Burke had the authority to control traffic during the race by requiring signage and marshals along the public roads, including at all intersections.

29.      At all times material to this action, Defendant Burke had the authority to prevent the 2023 Rasputitsa from being raced on its roads.

30.     At all times material to this action, Defendant Burke and/or Defendant D40 had the authority and/or ability to close the public roads to vehicular traffic during the 2023 Rasputitsa race.

      April 2023 Rasputitsa Race

31.     Upon information and belief, the April 2023 Rasputitsa race had over 2000 total participants and over 1200 riders in the 100k race.

32.     For the 2023 race, Defendant Sheriff's Office monitored one intersection during the entire 100k loop – either Mountain Road and 114 (from 8:00 am to 10:00 am) or White School Road and 114 (10:00 am to 2:00 pm). Defendant Sheriff's Office served as a

marshall stopping traffic as necessary to allow the riders to safely pass over the roads. There were no official race monitors or marshalls at many intersections during the 2023 Rasputitsa race.

33.    At all times material to this action, Defendants D40, Sheriff's Office and Burke did not close any of the roads used by the racers to vehicular traffic, including Carter and Brook Roads.

34.    At all times material to this action, Defendants D40, Sheriff's Office and Burke, knew, or should have known, that the Rasputitsa race participants did not follow the rules of the road, including, stopping at stops signs on the Town's rural road intersections, including at the intersection of Carter Road and Brook Road.

35.    Upon information and belief, at all times material to this action, Defendants D40, Sheriff's Office and Town of Burke, did nothing to enforce the rules of the race or the rules of the road, including stopping at all stop signs and/or racing on the right side of the road.

36.    At all times material to this action, Defendants D40, Sheriff's Office and Burke did not provide adequate signage to warn riders of oncoming traffic or dangerous intersections including at the intersection of Carter and Brook Roads.

37.    At all times material to this action, Defendants D40, Sheriff and Burke did not provide adequate signage to warn vehicular traffic of oncoming bikers/racers or to warn vehicular traffic of dangerous intersections, including on Carter and Brook Roads and at the intersection of Carter and Brook Roads.

38.    At all times material to this action, Defendants D40, Sheriff's Office and Burke did not provide adequate signage to warn vehicular traffic that the public roads were being used by riders for the race, including on Brook Road and Carter Road.

7

39.     At all times material to this action, the race course was operating on public roads which were open to vehicular traffic.

40.     At all times material to this action, Mr. Wanstall's bicycle was operating properly. At all times material to this action, Mr. Wanstall was wearing a proper bicycle helmet.

Accident

41.     As Richard Wanstall was racing his gravel bike at mile 17, he was racing downhill on Carter Road. The race was congested with racers in front of, behind and beside Mr. Wanstall. There were so many riders that maneuvering on the course was difficult.

42.     Mr. Wanstall was following the race route down Carter Road toward the intersection with Brook Road. A race sign indicated riders were to go to straight or to their left as they entered Brook Road. There was a race sign indicating the direction. (See below images.)[1]

---

[1] The second image is from the police who photographed the accident scene and was taken shortly after the accident. The orange warning cones were not on the road but were placed by the police after the accident.





43.    The intersection of Carter Road and Brook Road has a stop sign located to Mr. Wansall's right as he approached the intersection. (See above image.) As Mr. Wanstall attempted to enter onto Brook Road he did not stop but instead followed the line of bikers in front of him. He entered onto Brook Road by taking a line nearer to the corner to his left.

44.    This following photograph is the approximate view Mr. Wanstall would have seen

while racing and approaching the intersection.[2]



45.     No racers in front of him or on either side of him stopped for the stop sign before entering onto Brook Road. Also, upon information and belief, no riders in front of him or beside him slowed down. Mr. Wanstall did not stop and continued to travel as the other riders did approaching the curve that lead onto Brook Road. Mr. Wanstall was traveling at

---

[2] This undated image is from Google earth but accurately depicts the intersection.

approximately 20 mph as he approached the curve onto Brook Road.

46.    At the same time as Mr. Wanstall was riding his bike on Carter Road toward the turn

onto Brook Road, a 2007 Dodge Ram pickup truck operated by Alex Goss was traveling on

Brook Road toward the intersection of Brook Road and Carter Road.

47.    Prior to entering onto Brook Road, upon information and belief, Mr. Goss did not

know Brook Road was part of the race. Mr. Goss entered Brook Road and encountered a

large number of racers coming toward and past him. As Mr. Goss operated his truck on

Brook Road, he was unable to turn around due to the sheer volume of riders racing by him.

As Mr. Goss drove up Brook Road and approached Carter Road he was driving to the right

to avoid riders.

48.    At the same time as Mr. Wanstall was on Carter Road about to turn onto Brook

Road, Mr. Goss was on Brook Road attempting to turn to his right onto Carter Road. Mr.

Goss was operating his vehicle at 30 miles per hour when he saw Mr. Wanstall. Mr. Goss

would have seen this approximate view as he approached Carter Road to his right. [3]

---

[3] The image was taken by the police investigating the accident and was taken shortly after the accident.
The police cars and warning cones were not on the road at the time of the accident.



49.     At the point that Mr. Wanstall could have seen Mr. Goss or that Mr. Goss could have seen Mr. Wanstall, due to the speeds of Mr. Wanstall's bicycle and Mr. Goss's truck, it was too late. Mr. Goss's vehicle collided with Mr. Wanstall and his bicycle. As a result, Mr. Wanstall suffered severe injury and death.

50.     At all times material to this action, there was no signage on Carter Road or Brook Road warning racers of a dangerous curve or that cars were approaching. At all times material to this action, there was no signage on or near Brook Road warning vehicular traffic that racers would be merging from Carter Road onto Brook Road.

51.     At all times material to this action, as vehicles or riders approached the intersection of Brook and Carter Roads, the view for either was obstructed.

52.     At all times material to this action, there was no marshall directing traffic at the intersection of Carter Road and Brook Road or to warn riders/vehicles to slow down. The

Carter Road/Brook Road intersection is particularly dangerous since the riders are coming down a hill on Carter Road with increased speed before entering onto Brook Road.

53.    One witness who was following Mr. Wanstall stated the following in the police report of the incident:

> Ackerson advised he was in a group of 25 to 30 riders behind the deceased, Wanstall. Ackerson estimated their speed at approximately 30 MPH. Ackerson described the group of riders as taking up both lanes of the roadway and "bombing" down the dirt road. Ackerson advised many of the riders were riding on the wrong side of the roadway. Ackerson stated none of the riders were stopping at the stop sign. Ackerson advised at other intersections there had been event coordinators to let riders through, but not at this intersection.

54.    At all times material to this action, no volunteers or anyone affiliated with the race was present at or near the intersection of Carter Road and Brook Road to monitor the safe passage of vehicle and riders. It took in excess of 10 minutes after the collision for anyone official from the race to arrive and longer for emergency personnel to arrive. Emergency personnel were delayed getting to the scene due to the congested roads and poor planning.

55.    The  Caledonia Record reported that Burke Firefighter Jim Hinman, who was at the accident scene, said at the September 2023 Selectboard Meeting:

> "If there were marshalls at that intersection doing their job there should not have been an accident at that intersection; something has to be different."

> "We can't have something like that in the town. That was a preventable accident; we can't have that on the roads of the town of Burke."

### COUNT I – DEFENDANT D40 – NEGLIGENCE/WRONGFUL DEATH

56.    Paragraphs 1-47 are hereby re-alleged and incorporated herein by reference.

57.    At all times material to this action, Defendant D40 organized, supervised,

controlled and planned the race.

58.     At all times material to this action, Defendant D40 designed the 2023 Rasputitsa course over the public roads.

59.     At all times material to this action, Defendant D40 had the authority to place signage and marshals along the public roads, including at all intersections, during the race.

60.     Prior to and during the 2023 Rasputitsa race, Defendant D40 knew that most of the Rapsutitsa racers did not follow the rules of the road during the race and did not stop at stop signs.

61.     At all times material to this action, Defendant D40 owed all racers, including Mr. Wanstall, a duty to protect them from unreasonable risks of harm while participating in the race.

62.     Defendant D40 breached its duty to Plaintiff by, among other things,

1)      not limiting the size of the race to lessen the risks of vehicular-racer collisions;

2)      failing to have marshalls at each intersection to monitor traffic and prevent collisions between racers and vehicular traffic;

3)      failing to have marshalls at the intersection of Carter Road and Brook Road to monitor traffic and prevent collisions between racers and vehicular traffic;

4)      failing to have adequate warnings at intersections cautioning racers and vehicles alike to proceed with caution;

5)      failing to have adequate signage alerting vehicular traffic to oncoming racers;

6)      failing to close the race course roads to vehicular traffic during the race; and/or

7)      failing to supervise and monitor the bicycle race.

63.     As a direct and proximate result of Defendant D40's actions or omissions, Richard

Wanstall suffered serious bodily injury and death.

64.     As a result of Richard Wanstall's death, his heirs, have suffered, and will continue to suffer, compensable damages including lost financial, emotional and relational support.

65.     Plaintiff seeks damages pursuant Vermont's Wrongful Death Statute, 14 V.S.A. §§1491-1492 including, but not limited to:

- pecuniary damages

- loss of consortium

- loss of support

- lost intellectual, moral and physical training

- loss of care, nurture and protection

- loss of father/child relationship

- funeral expenses

66.     Plaintiff also seeks damages on behalf of the Estate of Richard Wanstall available pursuant to Vermont's Survival Statute, 14 V.S.A. §§1451-1453. Plaintiff seeks damages including, but not limited to:

- funeral expenses

- pain and suffering

- medical bills

- lost income.

**COUNT II – TOWN OF BURKE – NEGLIGENCE/WRONGFUL DEATH**

67.     Paragraphs 1-56 are hereby re-alleged and incorporated herein by reference.

68.     At all-times material to this action, Defendant Burke's Selectboard members were

officers and employees of the Town of Burke pursuant to 24 VSA 901 and 901a

69.    At all-times material to this action, the Selectboard members were acting in the scope of their employment for the Town of Burke.

70.    At all times material to this action, Defendant Burke, acting through its Selectboard, was involved in the discussion, planning and approval of each Rasputitsa race from 2015 to 2023.

71.    At all times material to this action, Defendant Burke, acting through its Selectboard, approved the Rasputitsa race each year from 2015 until 2023, to financially benefit the Town of Burke and its businesses and residents.

72.    At all times material to this action, Defendant Burke, acting through its Selectboard members, authorized Defendant D40 to hold the Rasputitsa race within the Town of Burke and to use its public roads.

73.    At all times material to this action, Defendant Burke, acting through its Selectboard, was authorized to close and/or control the use of roads within the town limits to ensure the safety of all persons who use such roads.

74.    At all times material to this action, Defendant Burke, acting through its Selectboard, had the authority to not approve the Rapsustitsa race each year.

75.    At all times material to this action, Defendant Burke, acting through its Selectboard, knew, or should have known, the numbers of riders in the Rasputitsa created an unreasonable risk of harm to users of the public roads, specifically, an unreasonable risk of collision between riders and vehicular traffic.

76.    Prior to and during the 2023 Rasputitsa race, Defendant Burke knew that most of the Rapsutitsa racers did not follow the rules of the road during the race and did not stop at

17

stop signs.

77.     At all times material to this action, Defendant Burke designed and/or approved the design of the 2023 Rasputitsa course over its public roads.

78.     At all times material to this action, Defendant Burke had the authority to control traffic during the race by requiring signage and marshals along the public roads, including at all intersections.

79.     Defendant Burke, acting through its Selectboard, owed users of its public roads, including Richard Wanstall, a duty to make sure the roads were safe to use during the 2023 Rasputitsa.

80.     Defendant Town of Burke, acting through its Selectboard, breached its duty to Richard Wanstall by, among other things:

    1)     Approving the 2023 Rasputitsa to use its public roads without an adequate plan to assure racer safety as well as vehicular safety;

    2)     Approving the 2023 Rasputitsa to use its public roads and not requiring the limitation of the size of the race to lessen the risks of vehicular-racer collisions;

    3)     Approving the 2023 Rasputitsa to use its public roads and not requiring marshalls at each intersection to monitor traffic and prevent collisions between racers and vehicular traffic;

    4)     Approving the 2023 Rasputitsa to use its public roads and not requiring adequate warnings at intersections cautioning racers and vehicles alike to proceed with caution;

    5)     Approving the 2023 Rasputitsa to use its public roads and not requiring adequate signage alerting vehicular traffic to oncoming racers;

6)    Approving the 2023 Rasputitsa to use its public roads and not closing the race course roads to vehicular traffic during the race; and/or

7)    Approving the 2023 Rasputitsa to use its public roads and failing to supervise and monitor the bicycle race.

81.    As a direct and proximate result of Defendant Burke's negligent actions or omissions, Richard Wanstall collided with the truck of Alex Goss and suffered serious bodily injury and death.

82.    As a result of Richard Wanstall's death, his heirs, have suffered, and will continue to suffer, compensable damages including lost financial, emotional and relational support.

83.    Plaintiff seeks damages pursuant Vermont's Wrongful Death Statute, 14 V.S.A. §§1491-1492 including, but not limited to:

- pecuniary damages

- loss of consortium

- loss of support

- lost intellectual, moral and physical training

- loss of care, nurture and protection

- loss of father/child relationship

- funeral expenses

84.    Plaintiff also seeks damages on behalf of the Estate of Richard Wanstall available pursuant to Vermont's Survival Statute, 14 V.S.A. §§1451-1453. Plaintiff seeks damages including, but not limited to:

- funeral expenses

- pain and suffering

- medical bills

- lost income.

## COUNT III – CALEDONIA SHERIFF'S DEPARTMENT–
## NEGLIGENCE/WRONGFUL DEATH

85.     Paragraphs 1-72 are hereby re-alleged and incorporated herein by reference.

86.     During the 2023 Rasputitsa, Defendant Sheriff, through the Sheriff and or its deputy sheriffs, were performing official duties for the Caledonia Sheriff's Department. The officials duties included traffic safety and traffic control.

87.      Defendant Sheriff, through the Sheriff and/or its deputy sheriffs, was involved in the planning of the Rasputitsa for the years preceding and including the 2023 race. Defendant Sheriff's participation included public safety and traffic control planning.

88.     At all times material to this action, Defendant Sheriff, through the Sheriff and/or its deputy sheriffs, assisted and participated in the planning of the 2023 Rasputitsa. Specifically, Defendant Sheriff, through the Sheriff and/or its deputy sheriffs, was present and participated in meetings with Defendants D40 and the Town of Burke to discuss traffic safety and the use of the sheriff's office for traffic control.

89.     In previous races and during the 2022 and 2023 Rasputitsa, Defendant Sheriff controlled traffic at one intersection beginning at 8:00 am. At all times material to this action, Defendant Sheriff knew the large number of riders in the race and the dangers of having so many riders on the road. At all times material to this action, Defendant Sheriff knew that many intersections were not marshalled during the race.

90.     At all times material to this action, Defendant Sheriff, knew or should have known that there was an unreasonable risk of harm to the public and the riders throughout the race course in 2023 and that marshalls were needed at every intersection.

91.     At all times material to this action, Defendant Sheriff, knew the race course roads and the numerous intersections throughout the race.

92.     Prior to and during the 2023 Rasputitsa race, Defendant Sheriff, knew that most of the Rapsutitsa racers did not follow the rules of the road during the race and did not stop at stop signs.

93.     At all times material to this action, Defendant had a duty to provide law enforcement and traffic control to protect the public and Mr. Wanstall from an unreasonable risk of harm while using the public roads during the 2023 Rasputitsa pursuant to 24 V.S.A. 291a.

94.     Defendant Sheriff breached its duty to Richard Wanstall by failing to, among other things:

1)      stop the 2023 race due to the obvious risks posed to the riders and vehicular traffic caused by the overwhelming number of riders;

2)      require more traffic control throughout the race;

3)      provide traffic control at each intersection including the Carter Road/Brook Road intersection;

4)      require marshalls at every intersection.

95.     As a direct and proximate result of Defendant Sheriff's negligence, Richard Wanstall collided with the truck of Alex Goss and suffered serious bodily injury and death.

96.     As a result of Richard Wanstall's death, his heirs, have suffered, and will continue to suffer, compensable damages including lost financial, emotional and relational support.

97.     Plaintiff seeks damages pursuant Vermont's Wrongful Death Statute, 14 V.S.A. §§1491-1492 including, but not limited to:

- pecuniary damages

- loss of consortium

- loss of support

- lost intellectual, moral and physical training

- loss of care, nurture and protection

- loss of father/child relationship

- funeral expenses

98.     Plaintiff also seeks damages on behalf of the Estate of Richard Wanstall available pursuant to Vermont's Survival Statute, 14 V.S.A. §§1451-1453. Plaintiff seeks damages including, but not limited to:

- funeral expenses

- pain and suffering

- medical bills

- lost income.

WHEREFORE, for the foregoing reasons, Plaintiff requests this Court enter judgment against Defendants D40 Gravel LLP, the Town of Burke, and the Caledonia Sheriff's Department, jointly and severally, and award damages, plus costs and interest, for personal injury, pain and suffering, wrongful death, medical bills, loss of consortium,

loss of support, loss of parent/child relationship, funeral expenses, punitive damages and any other relief this Court deems appropriate.

## PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS

Plaintiff respectfully requests a trial by jury of all issues involved in this matter.

DATED:     October 7, 2024
           Burlington, Vermont

Attorneys for Plaintiff Pamela Wanstall, Personal Representative and Administrator of the Estate of Richard Wanstall

By    */s/ Robert S. Behrens*
Robert S. Behrens, Esq.
Behrens Venman, PLLC
30 Elmwood Avenue
Burlington, VT 05401
rsb@bvslawvt.com

By    */s/ Christopher J. McVeigh*
Christopher J. McVeigh, Esq.
McVeigh Skiff, LLP
30 Elmwood Avenue
P.O. Box 1112
Burlington, VT 05402-1112
chris@mcveighskiff.com

23