UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2025 JUN 27  PM 1: 38**

CLERK

BY _____ᴸᴬᵂ_____
DEPUTY CLERK

PAMELA WANSTALL, as Personal          )
Representative and Administrator of the Estate  )
of Richard Wanstall,                  )
                                      )
        Plaintiff,                    )
                                      )
    v.                                )        Case No. 2:24-cv-00680
                                      )
D40 GRAVEL LLP,                       )
TOWN OF BURKE, VERMONT,               )
and CALEDONIA SHERIFF'S               )
DEPARTMENT,                           )
                                      )
        Defendants.                   )

**OPINION AND ORDER GRANTING MOTIONS TO DISMISS AMENDED
COMPLAINT BY DEFENDANTS D40 GRAVEL LLP AND TOWN OF BURKE**
(Docs. 36 and 37)

Plaintiff Pamela Wanstall brings this action as Personal Representative and

Administrator of the Estate of Richard Wanstall ("Mr. Wanstall") against Defendants

D40 Gravel LLP ("D40"), Town of Burke (the "Town"), and the Caledonia Sheriff's

Department. The case arises out of Mr. Wanstall's death from being hit by a pickup truck

while participating in the 2023 Rasputitsa, an annual bicycle race run by D40 and held in

the Town. Plaintiff seeks damages pursuant to Vermont's Wrongful Death and Survival

Statutes. 14 V.S.A. §§ 1451-53, 1491-92.

On October 7, 2024, Plaintiff filed an Amended Complaint asserting negligence

by Defendants in organizing, planning, and overseeing the bicycle race. Pending before

the court are D40's and the Town's motions to dismiss the Amended Complaint for

failure to state a claim, both of which argue that Plaintiff's claims are barred by a liability

waiver Mr. Wanstall signed when he registered for the race. (Docs 36, 37.) Plaintiff

opposed the motions on November 11, 2024. (Docs. 40, 41.) The Town and D40 replied

on November 18, 2024, and November 22, 2024, respectively, and Plaintiff filed a sur-reply responding to both motions on December 3, 2024, at which point the court took the motions under advisement.[1] (Docs. 42, 43, 45.)

Plaintiff is represented by Christopher J. McVeigh, Esq. and Robert S. Behrens, Esq. D40 is represented by Evan A. Foxx, Esq. The Town is represented by Brian P. Monaghan, Esq.

## I.    Whether Documents Not Attached to Amended Complaint Are Properly Before the Court.

D40's and the Town's motions to dismiss rely on the event waiver (the "Waiver") signed by Mr. Wanstall when he registered for the Rasputitsa.[2] D40 and the Town also cite a police report previously submitted as an exhibit to D40's motion to dismiss that was filed before Plaintiff filed her Amended Complaint. (Doc. 19-2.) The Amended Complaint does not include either document. It, however, quotes from the police report and references the Waiver by stating that "[a]s part of the online registration process, Mr. Wanstall signed a waiver" and "[a]s part of the waiver, Mr. Wanstall agreed to abide by the Rasputitsa organization's specific rules." (Doc. 33 at 3, ¶ 11.) Plaintiff asserts that the police report and Waiver cannot properly be considered by the court at the motion to dismiss stage. Defendants counter that both are integral to the Amended Complaint.

In reviewing a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the court may consider facts subject to judicial notice, facts alleged in the complaint, "any written instrument attached to [the complaint] as an exhibit[,]" "documents incorporated in [the complaint] by reference[,]" and any documents considered "integral to the complaint." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230

---

[1] Plaintiff filed her original complaint on June 21, 2024. (Doc. 1.) D40 filed a motion to dismiss the original complaint on July 30, 2024, and the Town filed a motion for judgment on the pleadings on September 10, 2024. (Docs. 19, 28.) The court denied both motions as moot after Plaintiff filed an Amended Complaint. (Docs. 39, 44.) The parties incorporate their previous arguments in favor of and against dismissal by reference.

[2] D40 initially attached this document to the motion to dismiss it brought prior to the filing of the Amended Complaint. (Doc. 19-1.) For ease of reference, the court cites the earlier docket number for the Waiver.

2

(2d Cir. 2016) (internal quotation marks and citations omitted). However, "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document" and that "there exist no material disputed issues of fact regarding the relevance of the document." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (internal quotation marks omitted) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)).

The Second Circuit has deemed a document incorporated into the complaint where the plaintiff "reference[d] the [document] in her complaint . . . and d[id] not contest its accuracy or authenticity." *Leroy v. Delta Air Lines*, 2022 WL 12144507, at *1 n.2 (amended summary order) (2d. Cir. Oct. 27, 2022); *see also Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (finding documents that the "complaint explicitly refers to and relies upon" were incorporated into the complaint); *but see Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (finding complaint did not incorporate documents where it "merely discussed these documents and presented short quotations from them").

A document is "'integral'" to the complaint if the complaint "'relies heavily upon [the document's] terms and effect[.]'" *Nicosia*, 834 F.3d at 230 (quoting *DiFolco*, 622 F.3d at 111). "This generally occurs when the material considered is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint." *Id.* at 231 (internal quotation marks and citation omitted).

The Amended Complaint refers to "a waiver of liability" that Mr. Wanstall signed as part of the online registration process for the race. (Doc. 33 at 3, ¶ 11.) The Amended Complaint also "relies heavily upon [the Waiver's] terms and effect" because the Waiver's exculpatory clause, if enforceable, "would undermine the legitimacy of" Plaintiff's claim. *Nicosia*, 834 F.3d at 230-31 (internal quotation marks and citation omitted). The Waiver is thus both incorporated by reference and integral to the Amended Complaint. *Cf. Gann v. Trabue*, 2020 WL 12309336, at *3 (N.D. Ga. July 27, 2020) (finding liability waivers neither referred to nor attached to complaint were "central to

3

"[p]laintiff's claims" and properly considered at motion to dismiss stage because they
"discuss any relief [plaintiff] may be entitled to"); *Cowles v. Bonsai Design LLC*, 2020
WL 3036067, at *3 (D. Colo. June 5, 2020) (finding liability waiver was "'central to'
[p]laintiff's negligence claim because the document is intrinsically tied with the claim's
merits").

Courts may not consider documents outside the pleadings on a motion to dismiss
if there are "disputes, even if of questionable viability, regarding the authenticity of these
documents." *Barberan v. Nationpoint*, 706 F. Supp. 2d 408, 415 (S.D.N.Y. 2010). In
filing her Complaint and the Amended Complaint, Plaintiff did not dispute the
authenticity of the waiver. She purports to do so in her sur-reply[3] responding to D40's
reply in support of its motion to dismiss the original Complaint, where she asserts that it
"has not been established, and cannot be established without discovery," whether the
Waiver "is the release [Mr.] Wanstall signed[,]" (Doc. 30 at 1), although she concedes
that Mr. Wanstall signed a release and does not deny that the electronic signature
appearing on the Waiver is his.

Because Plaintiff's argument was raised for the first time in a reply brief, the court
need not consider it. *See Windward Bora LLC v. Sotomayor*, 113 F.4th 236, 245 n.6 (2d
Cir. 2024) (deeming argument "improper because it was raised for the first time in
[party's] reply brief"); *Blue Cross and Blue Shield of Vt. v. Teva Pharm. Indus., Ltd.*, 712
F. Supp. 3d 499, 552 (D. Vt. 2024) (same). Even if the court considers it, an untimely and
vague claim that a waiver that bears Mr. Wanstall's signature may not be the correct
version need not be credited where Plaintiff fails to proffer any facts to support that claim
and where there appears to be no good faith basis to assert it. *See* Fed. R. Civ. P. 11(b);
*cf. United States v. Lingala*, 91 F.4th 685, 696 (3rd Cir. 2024) (noting that "the burden of
proof for authentication is slight") (internal quotation marks and citation omitted); *see*

---

[3] Plaintiff did not request permission to file a sur-reply. The court nonetheless considers it
because Defendants have not moved to strike it. *See CFGAdvance, LLC v. AgileCap, LLC*, 2021
WL 2336908, at *3 (D. Vt. June 7, 2021) (granting defendant's motion to strike sur-reply in part
because plaintiff did not properly seek leave of court to file it).

*also United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal quotation marks and citation omitted).

Because the Waiver was incorporated by reference and is integral to the Amended Complaint, and because no good faith dispute exists regarding its authenticity, accuracy, or relevance, the court considers it in deciding the pending motions to dismiss.

In contrast, inclusion of the police report is a closer call because the Amended Complaint quotes only one paragraph of the twenty-nine-page report in which a witness stated that many of the Rasputitsa riders were riding on the wrong side of the roadway and failing to stop at the stop sign. Generally, "[l]imited quotation of documents not attached to the complaint does not constitute incorporation by reference." *EEOC v. 98 Starr Rd. Operating Co.*, 682 F. Supp. 3d 414, 419 (D. Vt. 2023) (internal quotation marks and citation omitted). Accordingly, the court does not consider the police report in deciding the motions to dismiss. *See DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) ("To be incorporated by reference, the complaint must make 'a clear, definite and substantial reference to the documents.'") (quoting *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003)).

## II.    Allegations in the Amended Complaint.

Plaintiff was married to Mr. Wanstall at the time of his death and was appointed as personal representative of his estate on August 21, 2023. D40 is a limited liability partnership with its principal place of business in Newport, Vermont. Since 2015, excluding the years 2020 and 2021, D40 has run an annual gravel bicycle race called "the Rasputitsa" on the Town's public roads. (Doc. 33 at 3, ¶ 8.) On October 27, 2022, Mr. Wanstall registered online for the Rasputitsa. As part of the registration process, he "signed a waiver of liability." *Id.* at 3, ¶ 11. The Waiver states, in relevant part:

> 1. Assumption of Risk. I am aware that cycling and/or participation in an Event, involve inherent risks, including but not limited to collision with pedestrians, vehicles, other participants, animals, and fixed or moving objects; imperfect course conditions; surface hazards, including potholes; equipment failure; inadequate safety equipment; use of equipment or

5

materials provided to me by others; those associated with man-made and natural jumps; sickness or disease (including communicable disease); and weather conditions. I fully understand that participating in an Event is an extreme test of a person's physical and mental limits and may involve the risk of serious injury or death, economic loss, property damage or loss that may result from my actions, inactions or negligence, and also from the actions, inactions or negligence of others.

2. Release of Liability. I hereby forever release, waive, and discharge [USA Cycling ("USAC")], USA Cycling Development Foundation and each of their respective officers, directors, agents, employees, volunteers, independent contractors, members, clubs, officials, event directors, local associations, sponsors and affiliates as well as the [Union Cycliste Internationale], sponsors, organizers, property owners, law enforcement agencies, local governments, and other public entities, connected with an Event, and each of their respective officers, agents, employees, and volunteers (collectively, "Releasees") from any claims that may arise out of or are related to my participation in an Event, including claims arising from the ordinary negligence of Releasees.

3. Covenant Not to Sue and Indemnity Agreement. I will not make any claim against Releasees for injury, damage, death, or any other loss arising from or related to my participation in the Event. I understand that if I attempt to sue Releasees in violation of this agreement, Releasees may seek to recover all of their costs, including legal fees. I agree to indemnify, hold harmless, and defend Releasees from and against any actions, causes of action, claims, charges, demands, losses, damages, costs, attorney's fees, judgments, liens, indebtedness, and liabilities of every kind, whether known or unknown, including foreseen or unforeseen bodily injury and personal injuries and property damage that may be sustained by me or any other person in any way connected to, related to, or arising out of my participation in the Event.

. . .

9. Governing Law; Jurisdiction; Severability. This agreement shall be governed by and construed under the laws of Colorado, without regard to its choice of law rules. Any legal suit, action, or proceeding arising out of or relating to this agreement shall be instituted in the federal court located in Denver, Colorado, or state courts located in Colorado Springs and El Paso County. Each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. If any provision of this agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other provision of this agreement or invalidate or render unenforceable any other provision

6

in any other jurisdiction.

(Doc. 19-1 at 1-2.)

The April 29, 2023 race was Mr. Wanstall's first time "participat[ing] in the Rasputitsa or any gravel race." (Doc. 33 at 3, ¶ 10.) The race "was open to all who signed up for it" and paid the registration fee of $150 and "did not limit participants by experience or affiliation with any particular cycling club." *Id.* at ¶ 12. The event guide advised that "all roads are open to traffic" and instructed participants to "be constantly aware of your surroundings and abide by normal traffic rules." *Id.* at 3-4, ¶ 13 (internal quotation marks omitted). There were more than 2,000 participants.

Plaintiff contends that D40 designed and the Town "designed and/or approved the design of the 2023 Rasputitsa course over its public roads." *Id.* at 6, ¶ 27. She also alleges that "D40 had the authority to control traffic during the race by placing signage and marshals along the public roads," and that the Town "had the authority to control traffic during the race by requiring signage and marshals[.]" (Doc. 33 at ¶ 25, 28.) According to Plaintiff, the Caledonia Sheriff's Department monitored one intersection during the 100-kilometer loop on which Mr. Wanstall was racing, leaving "many intersections" with "no official race monitors or marshal[]s[.]" *Id.* at 7, ¶ 32. Plaintiff alleges that Defendants were aware that racers often failed to heed stop signs or follow other motor vehicle laws and that Defendants were aware of general safety concerns such as bikers colliding with vehicles. She contends Defendants "did nothing to enforce the rules of the race or the rules of the road" and did not provide adequate signage warning bikers and drivers of, among other things, oncoming traffic and dangerous intersections. *Id.* at ¶ 35.

Mr. Wanstall began the race in the morning. At the time of his fatal accident, "he was racing downhill on Carter Road[,]" and "[t]he race was congested with racers in front of, behind and beside Mr. Wanstall" which made "maneuvering on the course . . . difficult." *Id.* at 8, ¶ 41. "A race sign indicated riders were to go to straight or to their left as they entered Brook Road." *Id.* at ¶ 42. As Mr. Wanstall approached the intersection, a stop sign was located to his right. He did not stop, but "instead followed the line of bikers in front of him." *Id.* at 10, ¶ 43. According to Plaintiff, "[n]o racers in

7

front of [Mr. Wanstall] or on either side of him stopped for the stop sign before entering onto Brook Road." *Id.* at 11, ¶ 45. As Mr. Wanstall was riding toward the turn onto Brook Road, a pickup truck traveling Brook Road approached the intersection. Plaintiff alleges that the pickup truck driver "did not know Brook Road was part of the race . . . and encountered a large number of racers coming toward and past him." *Id.* at 12, ¶ 47. When the pickup driver entered Brook Road, he "was unable to turn around due to the sheer volume of riders racing by him[,]" and "was driving to the right to avoid riders." *Id.* The pickup truck collided with Mr. Wanstall, causing his "severe injury and death." (Doc. 33 at 13, ¶ 49.)

Plaintiff alleges D40 and the Town breached their duties to Mr. Wanstall by, among other things, allowing too many riders in the race; failing to install sufficient marshals, signage, and warnings to manage traffic on the racecourse; and failing to close racecourse roads to vehicular traffic. She alleges that "there was no signage on Carter Road or Brook Road warning racers of a dangerous curve or that cars were approaching" nor "signage on or near Brook Road warning vehicular traffic that racers would be merging from Carter Road onto Brook Road." *Id.* at 13, ¶ 50. She further alleges that the view for drivers and bikers approaching the intersection was obstructed, that the intersection was "particularly dangerous" because bikers were traveling downhill as they approached it, and because there was no marshal or anyone affiliated with the race directing traffic or warning riders to slow down. *Id.* at 14, ¶ 52. "Emergency personnel were delayed getting to the scene due to the congested roads and poor planning" and took more than ten minutes to arrive. *Id.* at 14, ¶ 54.

## III. Conclusions of Law and Analysis.

### A. Motion to Dismiss Legal Standard.

To survive a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Parties must allege sufficient facts to "nudge[] their claims across the line from conceivable to plausible[.]" *Twombly*, 550

8

U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The sufficiency of a complaint under Rule 12(b)(6) is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. The court is also "not bound to accept as true a legal conclusion couched as a factual allegation[.]" *Id.* (citation omitted). Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not "weigh the evidence" or "evaluate the likelihood" that a party will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

"Dismissal under Fed. R. Civ. P. 12(b)(6) is appropriate when a defendant raises . . . an affirmative defense and it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000). "[M]otions to dismiss a plaintiff's complaint under Rule 12(b)(6) on the basis of an affirmative defense will generally face a difficult road" because the court must "accept as true the material facts alleged in the complaint and draw all reasonable inferences in [a] plaintiff['s] favor." *Garcia v. Does*, 779 F.3d 84, 97 (2d Cir. 2015) (alterations adopted) (internal quotation marks and citations omitted). Notwithstanding this exacting standard, courts have dismissed claims at the pleading stage where they are barred by an unequivocal and binding release. *See Semon v. Rock of Ages Corp.*, 2011 WL 13112212, at *7 (D. Vt. Dec. 23, 2011) ("Whether an exculpatory clause bars a plaintiff's claim is a matter of contract interpretation, which 'is generally a question of law . . . suitable for

9

disposition on a motion to dismiss.'") (alteration in original) (quoting *Am. Auto. Ins. Co. v. Rest Assured Alarm Sys., Inc.*, 786 F. Supp. 2d 798, 803 (S.D.N.Y. 2011)).

### B.    Choice of Law.

D40 contends that Colorado law applies to Plaintiff's claims because the Waiver provides that the "agreement shall be governed by and construed under the laws of Colorado, without regard to its choice of law rules."[4] (Doc. 19-1 at 2.) Plaintiff asserts, and the Town does not dispute, that Vermont law governs.

Because the court is sitting in diversity, it "look[s] to the laws of the forum state in deciding issues regarding conflicts of law." *AHW Inv. P'ship v. Citigroup, Inc.*, 806 F.3d 695, 699 (2d Cir. 2015) (internal quotation marks omitted) (citing *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415 (2d Cir. 2006)); *see also Bigio v. Coca-Cola Co.*, 675 F.3d 163, 169 (2d Cir. 2012) ("In cases where jurisdiction is based on the diversity of the parties' citizenship, a federal court will apply the choice-of-law rules of the forum state[.]") (citation omitted). The Vermont Supreme Court "has adopted the Restatement (Second) of Conflicts for choice-of-law questions in both tort and contract cases." *McKinnon v. F.H. Morgan & Co.*, 750 A.2d 1026, 1028 (Vt. 2000).

Section 187 of the Restatement provides that "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Restatement (Second) of Conflict of Laws § 187(1) (1971). "[E]ven if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue," their choice of law will be applied unless:

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a

---

[4] The Waiver also provides that "[a]ny legal suit, action, or proceeding arising out of or relating to this agreement shall be instituted in the federal court located in Denver, Colorado, or state courts located in Colorado Springs and El Paso County." (Doc. 19-1 at 2.) However, neither D40 nor the Town have attempted to enforce this forum selection clause.

fundamental policy of a state which has a materially greater interest than
the chosen state in the determination of the particular issue and which,
under the rule of § 188, would be the state of the applicable law in the
absence of an effective choice of law by the parties.

*Id.* at § 187(2).

In this case, whether the exculpatory clause in the Waiver is unenforceable
because it is against Vermont's or another state's public policy cannot be resolved by
resort to the Waiver itself. *Id.* at § 187 cmt. D; *see Kearney v. Okemo Ltd. Liab. Co.*,
2016 WL 4257459, at *4 (D. Vt. Aug. 11, 2016) (observing that under Vermont law,
"whether the exculpatory clause is valid or void under public policy, is not [a question]
which the parties could have resolved by an explicit provision in their agreement").

Plaintiff cites *Kearney*, in which this court found that Colorado had no "substantial
relationship" to the parties or the transaction at issue when none of the parties were
domiciled in Colorado, and the plaintiff's injury occurred outside of Colorado. 2016 WL
4257459, at *4. Although the defendants in that case argued that Colorado law should
apply because one of the defendants, a ski and snowboard organization, had most of its
member clubs and major events in Colorado, the court found "that such a tenuous and
hypothetical connection does not vest in the state of Colorado a substantial relationship to
the parties or specific transaction at issue[.]" *Id.*

None of the defendants in this case are domiciled in Colorado, and neither the
Rasputitsa nor Mr. Wanstall's injury or death took place in Colorado. D40 contends that
Colorado nonetheless has a substantial relationship in this case because the race was
sanctioned by USAC, which is "a Colorado based legal entity" with its headquarters in
Colorado and "a substantial interest in ensuring that disputes arising from events that it
sanctions . . . are litigated in its home state." (Doc. 29 at 9.) The fact that USAC is a
Colorado legal entity headquartered in Colorado does not appear in the pleadings or
Waiver and is not properly before the court. *See Trump v. Vance*, 480 F. Supp. 3d 460,
478 (S.D.N.Y. 2020) (holding that "[i]n adjudicating a Rule 12(b)(6) motion, a court
must confine its consideration to facts stated on the face of the complaint, in documents
appended to the complaint or incorporated in the complaint by reference, and to matters

11

of which judicial notice may be taken") (internal quotation marks and citation omitted).

Even if the court took judicial notice of USAC's base in Colorado, USAC is not a party to this suit, and the extent of its involvement in the Rasputitsa is not clear from the Amended Complaint. At this juncture, a substantial relationship based solely on where a non-party to this suit is incorporated and headquartered has not been established.

Because the court cannot determine whether Colorado "has [a] substantial relationship to the parties or the transaction" or whether "there is no other reasonable basis for the parties' choice," Restatement § 187(2), it cannot determine as a matter of law whether the Waiver's choice-of-law provision is enforceable. It therefore analyzes D40's and the Town's arguments for dismissal under both Colorado and Vermont law. *See Pieciak v. Crowe LLP*, 2022 WL 10010523, at *4 (D. Vt. Oct. 17, 2022) (analyzing contract claims under both Illinois and Vermont law because "at the pleading stage, the court cannot make a choice of law determination without additional facts").

  **C.**  **Whether the Waiver is Enforceable Under Colorado Law.**

D40 argues that under Colorado law, Plaintiff's claims are barred by the Waiver, which refers to the Rasputitsa as a "USAC sanctioned event" and "release[s], waive[s], and discharge[s]" USAC's "sponsors, organizers, property owners, law enforcement agencies, local governments, and other public entities, connected with [the event]" from "any claims that may arise out of or are related to [Mr. Wanstall's] participation in [the event], including claims arising from . . . ordinary negligence[.]" (Doc. 19-1 at 1.) Although Plaintiff argues that Vermont law should apply, she does not argue that the Waiver is unenforceable under Colorado law.

To determine whether an exculpatory agreement is valid, Colorado courts "consider: (1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language." *Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981). The Colorado Supreme Court has identified the following factors as relevant to whether "a release agreement will be barred for affecting the public interest":

12

> [S]uch agreements generally involve businesses suitable for public regulation; that are engaged in performing a public service of great importance, or even of practical necessity; that offer a service that is generally available to any members of the public who seek it; and that possess a decisive advantage of bargaining strength, enabling them to confront the public with a standardized adhesion contract of exculpation.

*Chadwick v. Colt Ross Outfitters, Inc.*, 100 P.3d 465, 467 (Colo. 2004). Under Colorado law, public interest considerations generally do not apply to "businesses engaged in recreational activities, which are not practically necessary and with regard to which the provider owes no special duty to the public." *Id.* Colorado courts and federal courts applying Colorado law have therefore upheld exculpatory clauses in a variety of recreational contexts, including mountain biking and ski racing.[5]

Applying Colorado law, the majority of the four *Jones* factors weigh in favor of enforcing the Waiver. The service provided by Defendants was recreational, which under Colorado law does not implicate a public duty. Bicycle racing is not an essential or practically necessary activity, and Plaintiff does not contend that the Waiver was not fairly entered into or that it did not express the parties' intent in clear and unambiguous language. There is no evidence that the Waiver was an adhesion contract derived from "a decisive advantage of bargaining strength[.]" *Id.*; *see also Hamill v. Cheley Colorado Camps, Inc.*, 262 P.3d 945, 949-51 (Colo. App. 2011) (upholding exculpatory clause it pertained to a recreational, non-essential activity, was fairly entered, and plainly expressed intent to release negligence claims). Accordingly, the Waiver is enforceable under Colorado law.

---

[5] *See, e.g., Mincin v. Vail Holdings, Inc.*, 308 F.3d 1105, 1111 (10th Cir. 2002) (finding exculpatory agreement in rental agreement for mountain bicycle enforceable under Colorado law and noting that because "mountain biking is not an essential activity[,]" plaintiff was not in inferior bargaining position due to "practical necessity") (internal quotation marks omitted); *Potter v. Nat'l Handicapped Sports*, 849 F. Supp. 1407, 1409-10 (D. Colo. 1994) (noting, in support of enforcing exculpatory clause, that ski racing for handicapped skiers was recreational activity and not an essential service); *Chadwick*, 100 P.3d at 469 (upholding exculpatory clause where plaintiff was injured while riding mule during a guided hunt); *Jones*, 623 P.2d at 373, 377-78 (upholding enforcement of exculpatory contract against skydiver injured in plane crash).

### D. Whether the Waiver Is Enforceable Under Vermont Law.

D40 and the Town argue that the Waiver also bars Plaintiff's claims if Vermont law governs. Plaintiff, however, contends that under Vermont law, the Waiver is against public policy and thus unenforceable.

In contrast to Colorado law, Vermont law does not distinguish between recreational and non-recreational activities and essential and non-essential activities when deciding whether exculpatory agreements violate public policy. The Vermont Supreme Court's standard for the enforcement of contract provisions waiving negligence claims was established in *Dalury v. S-K-I, Ltd.*, 670 A.2d 795 (Vt. 1995). There, the plaintiff was injured by colliding with a metal pole while skiing at a resort operated by the defendants. 670 A.2d at 796. The Vermont Supreme Court held that the "exculpatory agreements which defendants require[d] skiers to sign, releasing defendants from all liability resulting from negligence, [were] void as contrary to public policy" even though the defendants were not providing an essential service. *Id.* In so ruling, it observed that the resort was "a facility open to the public . . . invit[ing] skiers and nonskiers of every level of skiing ability to their premises for the price of a ticket" and the "major public policy implications are those underlying the law of premises liability." *Id.* at 799. The court explained:

> The policy rationale is to place responsibility for maintenance of the land on those who own or control it, with the ultimate goal of keeping accidents to the minimum level possible. Defendants, not recreational skiers, have the expertise and opportunity to foresee and control hazards, and to guard against the negligence of their agents and employees. They alone can properly maintain and inspect their premises, and train their employees in risk management. They alone can insure against risks and effectively spread the cost of insurance among their thousands of customers. Skiers, on the other hand, are not in a position to discover and correct risks of harm, and they cannot insure against the ski area's negligence.

> If defendants were permitted to obtain broad waivers of their liability, an important incentive for ski areas to manage risk would be removed with the public bearing the cost of the resulting injuries. It is illogical, in these circumstances, to undermine the public policy underlying business invitee law and allow skiers to bear risks they have no ability or right to control.

14

*Id.* (citations omitted). Post-*Dalury*, this court has observed that "[t]he factors which were most consistently applied were whether the defendant was in control of the location where the injury occurred and whether these premises were open to the general public." *Littlejohn v. TimberQuestPark at Magic, LLC*, 116 F. Supp. 3d 422, 427 (D. Vt. 2015).

Regarding whether "the defendant[s] w[ere] in control of the location where the injury occurred[,]" Plaintiff argues that this factor weighs against enforceability because D40 and the Town either designed or approved the racecourse and had the authority to control traffic during the race by placing signage and marshals along the public roads. *Id.* A defendant's control over the location of injury, however, is not dispositive.[6] In *Provoncha v. Vt. Motocross Ass'n, Inc.*, the Vermont Supreme Court upheld a negligence waiver in a suit against the Vermont Motocross Association ("VMA") and an individual whose property was used for a VMA motocross event after one of the plaintiffs fell off his motorcycle and was struck by another motorcyclist. 2009 VT 29, ¶¶ 1-4, 185 Vt. 473, 475-76, 974 A.2d 1261, 1262-63. Although one of the defendants in *Provoncha* "owned and maintained" the land on which the plaintiff's injury took place, the court upheld the negligence waiver because the service provided by the defendants was "neither of great importance to the public nor open to the public at large." *Id.* at ¶¶ 1, 20, 185 Vt. at 475, 482, 974 A.2d at 1262, 1267. The court cited cases in which other courts had found that stock car racing, flight service for parachute jumping, and operating a diving school did not implicate the public interest and noted that "[u]nlike in the ski-resort cases, VMA does not permit the public at large to race in its scheduled events; only current VMA members are free to do so" and "VMA's membership is a mere 300 persons strong." *Id.* at ¶ 20, 185 Vt. at 482, 974 A.2d at 1267.

Like the recreational activity at issue in *Provoncha*, gravel bicycle racing is not a matter of necessity or an activity of great importance to the public. *See Walton v. Oz Bicycle Club of Wichita*, 1991 WL 257088, at *4 (D. Kan. Nov. 22, 1991) (finding that

---

[6] Unlike the owner of a ski resort, Defendants did not have exclusive control over the public roads at issue, and participants were not promised that the racecourse would be closed to vehicular traffic.

15

open road bicycle race was not matter of public interest and applying exculpatory clause on summary judgment). Unlike the VMA motocross event in *Provoncha*, the Rasputitsa "did not limit participants by experience or affiliation with any particular cycling club" and had more than 2,000 participants. (Doc. 33 at 3, ¶ 12.)

In *Thompson v. Hi Tech Motor Sports, Inc.*, the Vermont Supreme Court enforced a motorcycle dealership's negligence waiver for injuries sustained during test rides of its motorcycles and noted that, "unlike the ski area in *Dalury* that advertised to and invited all members of the general public, even those with no experience, defendant made no representation that it was making its motorcycles available to all members of the public or that it was providing training in the proper use of motorcycles." 2008 VT 15, ¶ 11, 183 Vt. 218, 224, 945 A.2d 368, 373. The court also noted that the "[d]efendant allowed only those persons who attested in a signed release that they were properly licensed with a motorcycle endorsement and had sufficient relevant experience and training to take defendant's bikes for a test ride." *Id.*

In this case, although there were no qualifications or membership requirements, and Mr. Wanstall was able to sign up without having previously participated in a gravel race, the Waiver required him to attest that he was "physically fit and sufficiently trained to participate in all activities associated with the [e]vent" and to acknowledge that "participating . . . [was] an extreme test of a person's physical and mental limits[.]" (Doc. 19-1 at 1, 3.) It also disclosed the very risk Mr. Wanstall encountered in clear and unequivocal language: "collision with pedestrians, vehicles, other participants, animals, and fixed or moving objects[.]" (Doc. 19-1 at 1.) This is analogous to the release signed by the plaintiff in *Thompson*. Although the plaintiff in *Thompson* argued that defendants were "negligent in encouraging her to ride a bike that they knew or should have known was too big for plaintiff and that she could not operate safely[,]" the court noted that the defendant did not "encourag[e] all persons to drive their vehicles" and required the plaintiff to attest that she had "examined the vehicle and [was] familiar with the vehicle's operation." 2008 VT 15, ¶¶ 3, 12, 183 Vt. 218, 221, 224, 945 A.2d 368, 371, 373.

In *Thompson*, the court also emphasized that individuals "who choose to take

defendant's motorcycles out for a test ride[] have the ability to undertake precautions to avoid hazards associated with operation, unlike skiers who 'are not in a position to discover and correct risks of harm' on a ski hill." *Id.* at ¶ 9, 183 Vt. at 223, 945 A.2d at 372 (quoting *Dalury*, 670 A.2d at 799). Similarly, Mr. Wanstall knew the racecourse was open to traffic, and the event guide to the race advised that participants should "abide by normal traffic rules." (Doc. 33 at 4, ¶ 13) (internal quotation marks omitted). The Amended Complaint concedes that Mr. Wanstall did not stop at a stop sign and does not contend Mr. Wanstall did not see the stop sign or was incapable of stopping at it. *Id.* at 11-13. Accordingly, this case does not implicate the same premises liability concerns underlying *Dalury*. 670 A.2d at 799.

Plaintiff cites three cases — *Littlejohn, Umali v. Mount Snow Ltd.*, 247 F. Supp. 2d 567 (D. Vt. 2003), and *Page v. Green Mountain Snowmobile*, 2022 WL 1242676 (Vt. Super. Jan. 31, 2022) — in which courts applying Vermont law found liability waivers unenforceable for public policy reasons in different recreational contexts. These cases are distinguishable. In *Littlejohn*, the plaintiff was injured at a zip-line adventure course "designed and controlled by defendants" when he accidentally attached his belay to the wrong wire. 116 F. Supp. 3d at 428. According to the plaintiff, "he was not warned that there were guy wires on the course in addition to safety cables and zip line cables or that he should avoid clipping onto the guy wires." *Id.* at 424.

In *Umali*, the plaintiff was severely injured in a dual slalom mountain bicycle race after he lost control on what he alleged was a particularly dangerous jump on the racecourse built by defendants. 247 F. Supp. 2d at 570. Whereas the plaintiff in *Umali* had no control over the dangerousness of a jump that the defendants designed and constructed, Mr. Wanstall had the ability to foresee and respond to risks from vehicles while riding on a road that he knew was open to traffic. In *Page*, the plaintiff was injured during a group snowmobile tour on a closed section of public road and argued that the defendants "acknowledged a duty to prepare and orient her to the snowmobile before the tour but that its preparation and orientation were insufficient and constituted negligence." 2022 WL 1242676, at *3. Defendants in this case did not undertake any duty to train Mr.

17

Wanstall, and the Waiver required participants to attest that they possessed the requisite level of skill and training to participate in the race. Moreover, the race took place on an open course without representations that vehicular traffic would be stopped or diverted. In that respect, Defendants did not have exclusive control over the premises.

For the foregoing reasons, the court agrees with D40 and the Town that under Vermont law, the Waiver is not void as contrary to public policy.

### E. Whether the Waiver Bars Plaintiff's Claims.

The party asserting the protection of a release bears the burden of establishing that it includes the claim in question. *See Smith v. Gainer*, 571 A.2d 70, 72-73 (Vt. 1990) (ruling that defendant's assertion that release barred all claims was an affirmative defense which defendant must establish). Courts "traditionally disfavor[] contractual exclusions of negligence liability," and, therefore, such provisions must "be construed strictly against the parties relying on them." *Colgan v. Agway, Inc.*, 553 A.2d 143, 145 (Vt. 1988). "The most effective way for parties to express an intention to release one party from liability flowing from that party's own negligence is to provide explicitly that claims based in negligence are included in the release." *Id.* at 146.

Plaintiff does not dispute that, if enforceable, the Waiver bars negligence claims against D40 and the Town. The Waiver identifies Rasputitsa as "the Event" and explicitly releases "organizers" and "local governments" from "any claims that may arise out of or are related to [Mr. Wanstall's] participation in [the event]," including "claims arising from . . . ordinary negligence[.]" (Doc. 19-1 at 1); *see Dalury*, 670 A.2d at 796-97 (finding language releasing defendant "from any and all liability for personal injury or property damage resulting from negligence" to be "quite clear in its terms."). Because it specifically includes negligence, the exculpatory clause is sufficiently clear to reflect the parties' intent to bar Plaintiff's negligence claims. *See Provoncha*, 2009 VT 29 at ¶ 13, 185 Vt. at 479, 974 A.2d at 1265 (holding that release form was sufficiently clear because it was "comprehensive as to type of claim" and identified "the causal nexus for the injury" in such a way that "naturally includes negligence"); *Douglass v. Skiing Standards, Inc.*, 459 A.2d 97, 98-99 (Vt. 1983) (finding agreement to release defendants

18

from "any and all claims, demands, liability, right or causes of action . . . arising from or in any way connected with[] any injuries, losses, damages, suffering" sustained by participation in a competition was "sufficiently clear to show the parties' intent that defendants were to be held harmless for any injuries or damages caused by their own negligence") (internal quotation marks omitted). The court therefore GRANTS the D40 and Town Defendants' motions to dismiss because the Waiver bars Plaintiff's claims.

### F. Whether the Vermont Sports Injury Statute Bars Plaintiff's Claims.

Vermont's Sports Injury Statute provides that "a person who takes part in any sport accepts as a matter of law the dangers that inhere therein insofar as they are obvious and necessary." 12 V.S.A. § 1037. "This defense remains viable even if the defendant's exculpatory agreement is found to be void as contrary to public policy." *Littlejohn*, 116 F. Supp. 3d at 429; *Spencer v. Killington, Ltd.*, 702 A.2d 35, 38 (Vt. 1997) (clarifying, in holding that ski resort's negligence waiver was unenforceable, that "[a]ssumption of risk remains as a defense").

This court has previously placed the burden of establishing a duty of care under the Vermont Sports Injury Statute on the plaintiff because "whether a duty exists in the first instance is a threshold issue that a party must establish in presenting his or her case to a jury." *Grajeda v. Vail Resorts Inc.*, 2023 WL 4303926, at *6 (D. Vt. June 30, 2023) (internal quotation marks and citation omitted); *see also Mahdessian v. Stratton Corp.*, 210 F.3d 355 (2d Cir. 2000) (unpublished table opinion) (holding that it "was not error" to place the burden on a plaintiff to prove a duty exists notwithstanding the Sports Injury Statute); *but see Mejia-Haffner v. Killington/Pico SKI Resort Partners, LLC*, 2016 WL 6476958, at *2 (D. Vt. Nov. 1, 2016) ("The court will place the burden of proof with respect to 12 V.S.A. § 1037 on the defendant.") (Crawford, J.).

> Under Vermont law, a "necessary" risk is one that "is impossible or unreasonably difficult or expensive to eliminate." *Dillworth v. Gambardella*, 776 F. Supp. 170, 172 (D. Vt. 1991), aff'd, 970 F.2d 1113 (2d Cir. 1992). Stated differently, "necessary dangers are those that are there even when due care is exercised. A person need accept only those risks that are inherent in the sport, not those increased risks that are cause[d] by another's failure to use due care." *Dillworth*, 970 F.2d at 1121

19

(internal citation omitted) (alteration in original).

*Grajeda*, 2023 WL 4303926, at \*7. Although "[t]he question of what dangers are obvious and necessary and therefore inhere in a sport is generally one for a jury to decide[,]" this court has held that "reasonable minds cannot differ" in deciding that ice is "an obvious and necessary danger in the sport of skiing," meaning there is no duty for a ski resort to warn patrons of a trail's icy conditions or to take steps to eliminate the ice. *Nelson v. Snowridge, Inc.*, 818 F. Supp. 80, 83-84 (D. Vt. 1993) (granting summary judgment for defendant).

In this case, the Amended Complaint contends that D40 had "a duty to protect [racers] from unreasonable risks of harm while participating in the race" and breached this duty by failing to limit the size of the race, install marshals at each intersection, close roads to vehicular traffic, or otherwise take steps to reduce or warn participants of vehicular collisions. (Doc. 33 at 15, ¶ 61.) Similarly, it contends that the Town breached its "duty to make sure the roads were safe to use during the 2023 Rasputitsa" by allowing the Rasputitsa race on its roads without additional safety conditions. *Id.* at 18, ¶ 79. Construing the Amended Complaint in the light most favorable to Plaintiff, Mr. Wanstall knew the Rasputitsa would be held on roads that were open to traffic, was warned to abide by traffic laws, and collided with a vehicle after not stopping at a stop sign. It would be impossible for D40 or the Town to eliminate the risk of colliding with a vehicle in an open-to-traffic gravel race. Plaintiff does not plead that Mr. Wanstall's injury and death survives the Sports Injury Statute. 12 V.S.A. § 1037. As a result, the absence of a duty under 12 V.S.A. § 1037 may provide an alternative ground for dismissing Plaintiff's claims.[7] *See Montague v. Hundred Acres Homestead, LLC*, 2019 VT 16, ¶ 14, 209 Vt. 514, 521, 208 A.3d 609, 614 ("Dismissal of a negligence action is appropriate where the plaintiff has not pled facts that, if true, could establish that the defendant had a duty of

---

[7] The court does not rely on this basis to dismiss Plaintiff's claims because neither D40 nor the Town raised it in their motions to dismiss. *See Grant v. Cnty. of Erie*, 542 F. App'x 21, 24 (2d Cir. 2013) (summary order) (finding district court erred by dismissing plaintiff's claims on a ground that the court raised *sua sponte*). The court raises this issue because neither party has addressed it in the event Plaintiff seeks leave to file a Second Amended Complaint.

care to the plaintiff."); *Sorge v. State*, 762 A.2d 816, 818 (Vt. 2000) ("The existence of a duty is a question of law to be decided by the court.").

## CONCLUSION

For the foregoing reasons, the motions to dismiss (Docs. 36, 37) filed by D40 and the Town are GRANTED. Because Plaintiff has already filed an Amended Complaint and has not requested further opportunity to amend her pleading and because further pleading may be futile, the court declines to grant leave to amend *sua sponte*. *See Horoshko v. Citibank, N.A.*, 373 F.3d 248, 250 (2d Cir. 2004) (noting a district court does not "abuse[] its discretion in not permitting an amendment that was never requested"). Plaintiff nonetheless may file a motion for leave to amend within twenty (20) days of the date of this Opinion and Order.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 27th day of June, 2025.

Christina Reiss, Chief Judge
United States District Court